# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1295V

|  |  |
|---|---|
| JYL ANN POTEET,<br><br>    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: February 27, 2024 |

*John Robert Howie, Howie Law, PC, Dallas, TX,* for Petitioner.

*Alexis B. Babcock, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On September 30, 2021, Jyl Ann Poteet filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered Guillain-Barré syndrome ("GBS") which was caused-in-fact by the influenza vaccine she received on October 3, 2017. Petition at 1, ¶¶ 1, 21. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. After Respondent conceded entitlement, the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Although I issued the ruling finding Petitioner entitled to compensation on February 4, 2022 (ECF No. 27), Petitioner did not communicate her demand to Respondent until late July 2022 (ECF No. 34). Following Respondent's response in late September 2022 (ECF No. 37), the parties indicated they had reached an impasse in their discussions (ECF No. 38). They completed briefing regarding the issue of damages on April 6, 2023. ECF Nos. 41-43.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$160,000.00**, reflecting actual pain and suffering. Petitioner is not, however, entitled to compensation for expected *future* pain and suffering.

**I.     Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of*

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were

*Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

## II.    The Parties' Arguments

Emphasizing the severe neck pain and headaches that accompanied her GBS illness, required significant pain medication, and necessitated a transfer to the critical care unit during her hospitalization, as well as significant and long-term residual symptoms (fatigue, gait abnormalities, tingling, and balance difficulties) which she maintains continued for more than five years, Petitioner asserts that she is entitled to an award of $160,000.00 for past pain and suffering, plus a future award of $600 per year. Petitioner's Motion for Ruling on the Record on Damages ("Motion"), filed Jan. 30, 2023, at 1-2, ECF No. 41. To support the duration she alleges, Petitioner provided affidavits from herself, her daughter (Kala Zegadlo), and several co-workers and friends (Drs. Thomas Binzer and Rick Ford), describing the limitations imposed by her GBS illness and difficulties Petitioner continues to experience. Exhibits 12-17. Acknowledging that her hospitalization was not lengthy, and she did not pursue inpatient rehabilitation or outpatient therapy, Petitioner insists that she returned to work after three weeks, not by choice, but due to "her concern that she might lose her job" as a surgical nurse. Motion at 18.

Petitioner favorably compares her circumstances to those experienced by the petitioners in *Robinson, Gross*, and *Johnson*[5] – cases involving past pain and suffering awards ranging from $160,000.00 to $180,000.00. Motion at 26-30. She observes that these petitioners also suffered initial GBS illnesses described as mild to moderate in severity, but experienced ongoing sequelae for years thereafter. *Id.* She emphasizes that the *Gross* petitioner similarly declined to pursue the offered outpatient therapy. *Id.* at 26. However, she offers several distinctions between her condition and that of the *Gross* petitioner, such as her need for additional medication to control her ongoing pain and evidence showing that "Mrs. Gross's ongoing symptoms were attributed by her treating neurologist, in significant part, to her pre-existing diabetes." *Id.* at 27.

---

assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] *Robinson v. Sec'y of Health & Hum. Servs.,* No. 18-0088V, 2018 WL 5820967 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $160,000.00 for actual pain and suffering); *Gross v. Sec'y of Health & Hum. Servs.,* No. 19-0835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. Mar. 11, 2021), *review denied,* 154 Fed. Cl. 109 (2021) (awarding $160,000.00 for actual pain and suffering); *Johnson v. Sec'y of Health & Hum. Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for actual pain and suffering).

In contrast, Respondent argues that Petitioner should be awarded only $77,500.00 for past pain and suffering, and insists the record does not support compensation for any *future* component. Respondent's Response to Petitioner's Motion ("Response"), filed Mar. 15, 2023, at 1, 14, ECF No. 42. Agreeing with Petitioner's characterization of the acute phase of her GBS illness as mild to moderate, he disputes Petitioner's description of her later symptoms. *Id.* at 8-11. And he attributes at least a portion of Petitioner's later symptoms to the requirements of her job, which often dictated that she remain on her feet for fifteen hours, or to the effects of several unrelated conditions. He thus insists that "given [P]etitioner's significant co-morbidities, there is preponderance of evidence that her ongoing symptoms are not exclusively or even primarily attributable to her GBS." *Id.* at 9.

Respondent also maintains the comparable cases cited by Petitioner underscore why a lower pain and suffering award in this case is appropriate. Response at 11-13. For example, he emphasizes the significant outpatient therapy attended by the *Johnson* and *Robinson* petitioners, and more severe symptoms experienced by the *Johnson* petitioner which prevented her from returning to work for three months. *Id.* at 11, 13. And, for even those cases, Respondent insists that the amounts he proposed during informal damages discussions were more appropriate. *Id.* at 12-13.

In her reply, Petitioner objects to Respondent's contention that some of the residual symptoms she experienced could be attributed to unrelated co-morbidities. Petitioner's Reply to Response ("Reply"), filed Apr. 6, 2023, at 1-8. Citing specific medical record entries, she insists that none of her treating physicians attributed her complaints to a condition other than GBS. *Id.* at 3 (citing Exhibit 5 at 128 (containing the opinion of Petitioner's cardiologist)). She also disputes some of the diagnoses mentioned by Respondent, such as osteoarthritis of the right knee and peripheral venous insufficiency. Reply at 8-14.

### III.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her GBS injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases

4

and rely upon my experience adjudicating these cases.[6] However, I ultimately base my determination on the circumstances of this case.

As the parties agree, the initial phase of Petitioner's GBS illness was mild to moderate – involving a five-day hospitalization (from November 8 to 12, 2017) and daily IVIG treatment. Her symptoms included severe headache and neck pain which required strong pain medication throughout her hospitalization and triggered a move to the intense care unit ("ICU") on the third day.[7] Although she gained significant relief from the administered IVIG therapy, Petitioner continued to experience symptoms. After her discharge, Petitioner returned to the emergency room four days later due to continued numbness in her hands and feet. Exhibit 10 at 13. At her November 21, 2017 appointment, Petitioner's neurologist prescribed additional medication (Tizandine) to address her continued neck pain. Exhibit 8 at 10-13.

Although Petitioner returned to work in early December 2017, she continued to require medication – Gabapentin at night and Tizanidine during the weekends. Exhibit 8 at 14-17. And she has provided detail affidavits from her daughter and co-workers, that support her assertion of ongoing sequelae. For example, Dr. Ford, an orthopedic surgeon whom Petitioner often assisted during surgery, states that Petitioner's ability to work long hours in the operating room has never returned – causing him to alert his surgical schedule, that Petitioner often has to spread her arms or hold on to railings to assist in her balance, and that Petitioner is unable to take needed nerve pain medications "during a work week due to sudation side effects." Exhibit 12 at 1.

The scarcity of medical treatment during 2018 is understandable considering Petitioner, as a health care provider, was aware that such residual GBS symptoms often require additional time to abate, and can only be managed. During appointments with her cardiologist and primary care provider, Petitioner continued to mention symptoms that her treating physicians agreed could be attributed to her GBS illness. *E.g.,* Exhibit 5 at 128

---

[6] Statistical data for all GBS cases resolved in SPU by proffered amounts from inception through January 1, 2024 reveals the median amount awarded to be $171,133.72. The awards in these cases - totaling 364, have typically ranged from $128,645.56 to $256,835.75, representing cases between the first and third quartiles and awards comprised of all categories of compensation – including lost wages. 47 cases include the creation of an annuity to provide for future expenses.

Past pain and suffering amounts awarded in substantive decisions issued in 34 SPU GBS cases range from $92,500.00 to $192,500.00, with an additional case involving annuity payments. The median amount past pain and suffering award in these 35 cases was $165,000.00, with awards falling within the first and third quartiles ranging from $155,000.00 to $180,000.00.

[7] The medical records show Petitioner required Dilaudid, Norco, and Tramadol throughout her hospitalization to combat her headache and neck pain. Exhibit 7 at 321-326. In the early morning of November 10, 2017, the third day of her hospitalization, Petitioner was transferred to the critical care unit due to her increased neck pain. *Id.* at 280. Dilaudid, Norco, and Tramadol are all strong pain medications. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 520, 878-879, 1290, 1950 (32nd ed. 201 ).

(reporting ongoing fatigue due to GBS in September 2020). And, if even they did not rise to the level that warranted further treatment, I recognize Petitioner was unable to engage in activities she previously enjoyed, such as horseback riding and barrel racing. *See* Exhibit 16 at ¶¶ 14-15; Exhibit 17 at ¶ 5 (2nd affidavits of Petitioner and Dr. Ford).

Nevertheless, Petitioner was able to perform the very demanding requirements of her job. As early as December 2017, approximately one month after her hospitalization, she reported doing better in the mornings, possessing the dexterity needed to perform sutures during surgery, and a lack of sleepiness while driving home, but some weakness and fatigue at the end of the day. Exhibit 8 at 14. Although I accept Petitioner's assertions that she returned to work sooner due to a fear of losing her job, and performed any needed tasks despite her ongoing sequelae,[8] her actions show that her symptoms were not as severe as she may now contend.

Furthermore, Respondent has persuasively established that other factors (Petitioner's age and co-morbidities) would have logically contributed to any ongoing fatigue and difficulties performing her work duties. The medical records show that Petitioner experienced syncope and exertional dyspnea in early 2019, and suffered from edema in her lower extremities (worse in her left leg) due to venous insufficiency in late 2019 and early 2020. *E.g.,* Exhibit 5 at 120; Exhibit 8 at 27, 30. In addition, prior to her GBS illness Petitioner suffered from diabetes (though well-controlled), heart disease which required the placement of a stent in 2015, and history of seizures due to venous anomaly in the brain, although she had avoided any seizure for years through medication. *E.g.,* Exhibit 4 at 7; Exhibit 5 at 17-18; Exhibit 8 at 6.

I find that Petitioner's circumstances most closely mirror those experienced by the *Gross* petitioner, who received the same past pain and suffering award Petitioner espouses. Both petitioners experienced significant improvement after a five-day course of IVIG therapy, but suffered continued residual symptoms for several years. *Gross,* 2021 WL 2666685, at *4-5 However, the ongoing symptoms in both cases were not severe enough to warrant further treatment and could be attributed, in part, to other conditions. *Id.*

Still, as I have explained previously (often at expedited "Motions Day" hearings), GBS pain and suffering awards generally should be higher than those awarded to SIRVA claimants, and statistical data derived from past awards supports that premise. *See supra* note 6. Thus, Petitioner's pain and suffering award should be greater than the $77,500.00 proposed by Respondent. Weighing all of the above, I deem the amount proposed by

---

[8] This assertion is supported not only by Petitioner's affidavit (Exhibit 16), but also by entries in the medical records. *See,* e.g., Exhibit 11 at 4.

Petitioner ($160,000.00) to be fair and reasonable.

However, I do not include any component of damages for future pain and suffering. Future pain and suffering awards are appropriate "only for cases where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). In this case, Petitioner has not established that the sequela of her SIRVA continued beyond the very mild – yet improving - symptoms she reported in 2020, and she suffered from co-morbidities which could account for, at least a portion, of these difficulties. I find the record does not establish a notable permanent loss that would justify this component of damages.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $160,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering,[9] and no future/projected pain and suffering award is warranted.**

**I therefore award Petitioner a lump sum payment of $160,000.00, representing compensation for actual pain and suffering in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

                                                 **s/Brian H. Corcoran**
                                                 Brian H. Corcoran
                                                 Chief Special Master

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.